UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: THE MATTER OF PARKER                    CIVIL ACTION
DRILLING OFFSHORE USA, L.L.C.
ETC.                                           NUMBER: 03-2611

                                               SECTION: "C"(5)

**ORDER AND REASONS**

Presently before the Court is the claim for damages of Mr.
Lonnie Cortney Campbell, hereinafter referred to as plaintiff.  Mr.
Campbell was, at all relevant times, an employee of Frank's Casing,
working as a hammer's helper on the Parker jack-up rig 14-J on
September 11, 2003.  On that date, due to improper maintenance by
Parker, one of the legs of the rig collapsed, causing the rig to
suddenly list precariously.  Plaintiff was injured as a result of
this incident and Parker has accepted liability.  There is no
comparative fault on the part of the plaintiff in connection with
the rig collapse.

Plaintiff  testified  that  he  boarded  a  vessel  in  Venice,

Louisiana and was transported to the Parker 14-J in order to perform a job that Frank's Casing had contracted to do.  When he arrived at the rig, a safety meeting was conducted and, around 10:30 a.m. on September 11th, he and others were told there were jacking problems with the rig, causing some type of overheating. Plaintiff was told to take a nap and that he would be called when he was needed to begin work.

Plaintiff retired to an eight man sleeper on the heliport of the 14-J and went to bed around noon.  Sometime between 3:00 and 3:30 p.m. on September 11th, the 14-J started to collapse, causing plaintiff to fall out of the top bunk where he was sleeping and to land on top of another employee.  Plaintiff's head and upper body hit the floor of the sleeper, while his lower body fell into the side of the bottom bunk.  Plaintiff initially thought the sleeper he was in had fallen off the rig entirely.  He immediately got up from the floor and went to the locker where he had personal belongings, retrieving pictures of his wife and children. Plaintiff further testified that, when he located his wallet, he put it in his underwear for identification purposes.  He, then, put on a life jacket, gave one to another employee and began attempting to exit the rig.

When plaintiff opened the door to the sleeper, he saw nothing but smoke.  Clad only in his underwear, plaintiff began running

2

until he found some stairs.  Along the way, he found other workers in distress and attempted to help them as best he could.

Plaintiff testified, quite understandably, that he believed he would lose his life in this situation.  He feared that the rig would completely go over because he observed part of the deck of the rig was in the water and it appeared that the crane was going to fall into the Gulf of Mexico.  When plaintiff finally reached the water, he swam away from the rig as best he could utilizing a "doggie paddle" to propel himself. Ultimately, he was able to reach a rescue boat and was pulled to safety.

In the current litigation, plaintiff claims damages to his neck, lower back and wrist as well as significant post traumatic stress disorder.  Plaintiff was 31 years old on the date of the accident, being born on April 19, 1972.

Suffice it to say that plaintiff had, prior to this incident, suffered significant problems with his back as will be recounted hereinafter.  Because of his prior treatment for significant work related injuries, Parker has argued that it should not be responsible for anything other than compensating plaintiff for an exacerbation of prior existing conditions, which have already returned to a pre-accident level in Parker's estimation. Accordingly, a careful examination of plaintiff's medical records is in order.

3

Plaintiff was treated by Dr. Carl J. Richard, a family practitioner, between 1976 and 2002 for various conditions. Of pertinence to this matter are notations on January 30, 1996 of headaches and stiffness of the neck and on February 2, 1996 of back stiffness.

On January 19, 1997, plaintiff sustained a work related accident while employed with Marine Drilling Companies, Inc.. Thereafter, on January 27, 1997, he began consulting with Dr. James C. McDaniel, an orthopedic surgeon, relating that he had fallen about eight to ten feet before being caught by a safety line. As a result, he complained of lower back pain and of a sharp pain radiating down his right leg. An MRI performed on January 27, 1997 at Laborde Diagnostics in Lafayette revealed a small focal disc herniation with mild compression of the thecal sac at L5-S1. On January 29, 1997, following his review of an MRI, Dr. McDaniel opined that plaintiff had a small bulge to the right of L5-S1, with mild degenerative changes and no neurological deficits. The doctor did, however, acknowledge that plaintiff complained of a fair amount of radicular discomfort. An epidural steroid injection was administered to the affected area and plaintiff was given Naprosyn, Norflex and Ultram.

On a follow up visit of February 3, 1997 with Dr. McDaniel, plaintiff still complained of significant soreness, stiffness and

aching in his leg and back.  The doctor opined that plaintiff could not work or drive for long periods to get to and from work. Exercise was prescribed to loosen the tightness which the doctor observed.

On February 13, 1997, plaintiff consulted with Dr. Louis C. Blanda, Jr., an orthopedic surgeon, having been referred by his attorney.  Plaintiff advised that he was suffering from low back pain which radiated into his right posterior thigh and calf.  Dr. Blanda's examination revealed that plaintiff's straight leg raising test was negative and that he did not suffer with spasm. His motor examination was considered normal and plaintiff was able to heel and toe walk.  Dr. Blanda opined that he believed plaintiff's treatment to have been appropriate thus far but that he did not feel plaintiff should return to work which involved any type of heavy exertion.  Dr. Blanda further opined that some prolonged physical therapy was appropriate and that epidural injections might provide plaintiff with some relief.

As of February 17, 1997, plaintiff told Dr. McDaniel that he no longer had leg pain.  However, he was having backache and  pain into the upper iliac crest area.  He had a fairly good range of motion but some limitation of extension was noted without spasm. Plaintiff complained that his pain medication was not working and this was changed.  The doctor opined that plaintiff should remain

5

active and could do medium work so long as that did not involve riding on a crew boat or doing repetitive bending and lifting.

On February 26, 1997, plaintiff initiated suit against Marine Drilling, claiming that he had suffered injury for which he was currently receiving treatment.

On March 18, 1997, plaintiff again consulted with Dr. Blanda. At that time it was noted that plaintiff was still having problems with his back and with leg pain, particularly on the right side although bilateral leg pain still occurred on occasion.  Spasm was noted as was a positive straight leg raising test on the right. Plaintiff refused the offer of another epidural injection and Dr. Blanda opined that he did not believe that plaintiff was ready to return to work at that time.

Plaintiff had a return visit on May 1, 1997 with Dr. Blanda. He complained of increased pain in his back and of pain down into both legs along with tingling and numbness.  Dr. Blanda decided to order an EMG study and to cease physical therapy.

On June 3, 1997, it was noted by Dr. Blanda that Mr. Campbell's EMG studies were within normal limits but the doctor opined that plaintiff suffered with herniated disc type syndrome. On that date plaintiff was complaining of tingling in his legs but with no definite radiculapathy.  Dr. Blanda referred plaintiff to Dr. Hodges for low back rehabilitation.

On June 18, 1997, plaintiff consulted with Dr. Daniel L. Hodges who is board certified in physical medicine and rehabilitation.  He described his pain as an aching, stabbing, discomfort at the lumbosacral junction which was exacerbated during any sort of physical activity.  Dr. Hodges opined that plaintiff suffered with mechanical low back pain, discogenic in origin, and facet syndrome.  Plaintiff was started on Daypro, Visteral, Amitriptyline, Lortab and a Medrol dose pack.

On July 9, 1997, plaintiff again consulted with Dr. McDaniel who opined that plaintiff had aggravated a mildly degenerative disc at L5-S1.  The doctor further opined that plaintiff had responded rapidly to conservative measures and was currently experiencing very minimal leg symptoms.  Dr. McDaniel further believed that any discomfort which plaintiff was currently experiencing was not consistent with any L5-S1 nerve root irritation and again noted that plaintiff's EMG and nerve conduction studies were normal. The doctor opined that there was no reason why plaintiff should not be able to return to some moderate type of work activity; that there was no reason to continue with physical therapy as plaintiff was capable of exercising on his own; and, lastly, that after a short period of medium type work, plaintiff could resume his normal work activities. Plaintiff did not thereafter return to Dr. McDaniel.

However, on July 16, 1997, plaintiff again consulted with Dr.

7

Hodges who noted that Mr. Campbell was doing reasonably well at the present time.  Dr. Hodges believed that physical therapy should continue as ordered, as should plaintiff's current medications.

On August 20th, when Dr. Hodges saw plaintiff the next time, Mr. Campbell was complaining of mechanical back discomfort.  Dr. Hodges referred plaintiff to Dr. John Grimes for a vocational rehabilitation assessment as well as a functional capacity evaluation.  Plaintiff was started on Buspar at this point in time.

On August 26, 1997, plaintiff again consulted with Dr. Blanda who noted that he was still complaining of back and bilateral leg pain.  It was noted that plaintiff believed he was doing well while on physical therapy, but that the workers' compensation carrier had apparently refused to further pay for it.  Spasm was noted in his back when plaintiff performed range of motion exercises.  Straight leg raising tests were positive.  Plaintiff suffered no muscle atrophy and no neurological deficit.  Dr. Blanda concurred that an FCE was probably in order and that plaintiff should be able to return to some type of modified work activity pending the results of his FCE.

There was some delay in the performance of the FCE but Dr. Hodges' records indicate that as of October 14th the FCE had been completed.  Plaintiff was dealing with increased back complaints following his FCE but Dr. Hodges noted that overall he seemed to be doing reasonably well.  Dr. Hodges discontinued plaintiff's

prescription for Daypro and substituted Voltaren.   The doctor opined that work hardening might be appropriate at this stage depending on the outcome of the FCE.   As of November 18th, Dr. Hodges noted that plaintiff was doing reasonably well and his recent FCE indicated that he could perform heavy duty work. However, Dr. Hodges indicated that he would feel better releasing plaintiff to medium duty instead and did so that day.   As of December 12th, Dr. Hodges noted that plaintiff had increased complaints of right lower extremity pain particularly over his lateral hamstrings but that he had minimal mechanical back complaints.   The doctor gave plaintiff a limited prescription of Darvocet and a Medrol dose pack.  On December 17, 1997, Dr. Hodges noted that plaintiff was doing a bit better overall since his prior visit.   He was no longer in acute lumbosacral pain.   Relafen was added to his medications.   It was noted that plaintiff would be seen on an open basis in the future.

Shortly thereafter, in early March 1998, plaintiff settled his litigation with Marine Drilling Companies and on July 28, 1998 plaintiff was hired on by Broussard Brothers as a crewman.

On November 19, 2001 plaintiff consulted with Dr. Roland Miller, an orthopedic surgeon in Abbeville, Louisiana, for back and left leg pain of two months duration.  Plaintiff gave no history of any specific injury but related that he felt his left leg was weaker than his right and that his ankle was also giving out.   He

further complained of muscle spasms in his left calf at night.  Dr. Miller observed that plaintiff had normal reflexes and normal sensation in his lower extremities but he did have a positive straight leg raising test on the left and some atrophy in the left leg.  The doctor felt that there was a high probability that plaintiff suffered with a herniated disc and nerve root pressure. Anti-inflammatory medication was prescribed as was a Medrol dose pack.  Plaintiff was instructed to return in one week.

On November 28, 2001 plaintiff returned to Dr. Miller at which time significant lumbar radiculapathy was noted with no improvement with conservative treatment initiated at his last visit.  As plaintiff still related severe pain, Dr. Miller opined that an MRI of the lumbar spine was necessary to rule out a herniated disc. Plaintiff was utilizing Demerol to assist him with sleep.

On December 3, 2001 plaintiff returned to Dr. Miller after having undergone an MRI on November 29, 2001.  That MRI revealed a "diffuse annular bulge at L5-S1 with broad based central/right para-central posterior lateral and posterior lateral protrusion of the discs effacing the ventral aspect of the thecal sac to the right of midline and narrowing the right L5-S1 neural foramen." Dr. Miller acknowledged on December 3rd that the MRI showed a herniated disc at the L5-S1 level, possibly more to the right then the left, which appeared to be at least moderate in size.  Epidural steroid injections were recommended and Dr. Miller wished to pursue

conservative treatment initially.

Dr. Miller saw Mr. Campbell again on January 9, 2002 for back and left leg pain.  The doctor again recognized that plaintiff had a fairly significant herniated disc at the L5-S1 level as shown on the MRI and further recognized that the epidural steroid injections which he had received did not assist him very much.  However, being off work did help him.  The doctor made arrangements for plaintiff to receive VAX-D treatment.  It was further noted that plaintiff had a slightly positive straight leg raising test on the left and that he complained of occasional numbness over the anterior lateral aspect of his left thigh.  Weakness of the left leg was noted, as was atrophy of the left calf and thigh.  The doctor opined that if plaintiff did not improve with VAX-D treatments he would probably need to have surgery.  Muscle relaxants and pain medication were prescribed.

Dr. Miller referred plaintiff to the Headache and Pain Center in Gray, Louisiana where he was seen by Dr. Aldopho Quadra.  A discharge summary generated by Dr. Quadra on January 23, 2002 recognized that plaintiff presented with symptomatic diffuse annular bulges at L5-S1 with right L5-S1 foramen narrowing.  Dr. Quadra treated plaintiff with caudal epidural steroids and physical therapy.  Thereafter, plaintiff decided to continue follow-up treatment with Dr. Miller.  Plaintiff continued to receive medication refills from Dr. Miller without further office visits.

11

At some point in May, Dr. Miller refused to renew plaintiff's medication, saying he needed to consult with a neurosurgeon because there was nothing more Dr. Miller could do to benefit plaintiff. The doctor felt surgery was now in order. Plaintiff did not accept a referral from Dr. Miller.

On June 13, 2002 plaintiff consulted with Dr. Randy Lavespere, a family practitioner, for back pain of six to eight months duration. It was noted that plaintiff did not wish back surgery at that time despite having a possible ruptured disc. On August 30th plaintiff again saw Dr. Lavespere for chronic low back pain, tingling and numbness in his left thigh. Lortab and Soma were prescribed. As of December 11, 2002 plaintiff was requesting the name of a neurologist from Dr. Lavespere. Again, on March 28, 2003 Dr. Lavespere prescribed Lortab, Soma and Advil for plaintiff's chronic back pain.

Thereafter, it appears that plaintiff had not been regularly seeing physicians until the accident of September 2003 which forms the basis of this litigation. On September 13, 2003 plaintiff contacted Dr. Lavespere telephonically to advise that he had been injured when the rig collapsed on September 11th. Plaintiff advised that, in addition to having been thrown from the top bunk and landing on the back of his head, he escaped the rig by jumping 15 to 20 feet into the water. Thereafter, he had to swim away until he was pulled into a crew boat. In addition to back and shoulder

12

pain, he complained of his right ankle and left thigh, of numbness down his leg and of being unable to turn his neck.  On September 16, 2003, Dr. Lavespere noted that plaintiff was still obviously shaken from the incident and was unable to sleep.  Plaintiff advised that he would not go back to work on the water and that he was "scared to death".  Spasm was noted on September 25, 2003 and on that same date, plaintiff began consulting with Dr. Michael Berard for treatment of acute post-traumatic stress disorder. However, those records will be discussed hereinafter in a chronological fashion.

With regard to plaintiff's physical injuries, he again saw Dr. Lavespere on October 7, 2003 for anxiety and insomnia.  It was noted that he was seeing Dr. Berard for PTSD.  At that time, the plaintiff would not allow the doctor to shut the door while speaking with him due to anxiety.  Plaintiff was complaining of numbness and tingling in his left leg with radiation down the posterior area of the leg.  He related a history of back problems in the past but insisted that he was fine until his most recent incident.  Plaintiff complained of numbness in both hands and constant neck pain which felt like he had balls under both shoulders.  Plaintiff's range of motion was limited as was his ability to flex his back.  The doctor determined that an MRI would be in order.  That test was performed on October 8, 2003 at Nydic Open MRI in Lafayette and revealed a "broad based central/right

13

paracentral/posterolateral protrusion at L5-S1 disc with borderline central stenosis and right/sided foraminal narrowing." As to his neck, the MRI revealed "left posterolateral protrusion at the C6-C7 disc level abutting the ventral aspect of the cord laterally on the left and narrowing the left C6-C7 neural foramen." Spurring and spondylitic changes at C4-C5 and C5-C6 were also noted.

On October 20, 2003 plaintiff returned to Dr. Lavespere complaining that his neck was bothering him in certain positions and that turning to the right or looking upward caused almost unbearable pain. He also complained of numbness in his hands and problems with his left leg. Plaintiff was referred to Dr. Appley for evaluation. At a follow-up visit with Dr. Lavespere on December 18, 2003 it was noted that plaintiff was still suffering with nightmares and insomnia. His Xanax was doubled by Dr. Lavespere. It was also noted that he was still seeing Dr. Berard for PTSD. Chronic neck and back pain were documented.

On December 22, 2003, Mr. Campbell consulted with Dr. Alan J. Appley, a neurological surgeon. Dr. Appley noted plaintiff's complaints of neck pain at the end ranges of motion, pain in both forearms, parathesis in the first three fingers of his right hand when speaking on the telephone, numbness of the left hand when he sleeps, low back pain radiating into both buttocks and down the posterior thighs and lower leg and numbness in the left lateral thigh.

14

Dr. Appley noted that on October 8, 2003 an MRI of the cervical spine from Nydic Open MRI showed a left-sided disc herniation at C6-7 and bilateral spondylosis at C4-5 and C5-6. An MRI of the lumbar spine from the same date showed a broad based disc herniation to the right of L5-S1. Right-sided S-1 nerve root impingement and right-sided foraminal narrowing with potential right L-5 nerve root impingement in the foramen were also noted. Plain x-rays of the lumbar spine from Abram Kaplan Memorial Hospital on December 2, 2003 showed degenerative disc disease at L5-S1. It was noted that plaintiff's current medications included Lortab, Klonopin, Remeron and Soma. Neck spasm was noted. Straight leg raising was positive on the left in the sitting position.

Dr. Appley diagnosed cervical disc herniation as a result of the September 11, 2003 accident. Cervical spondylosis aggravated by the accident was documented as was cervical sprain and/or strain also caused by the accident. Lumbar degenerative disc disease aggravated by the accident as well as lumbar sprain or strain secondary to the accident and post-traumatic stress disorder were diagnosed. The doctor concluded that plaintiff would best be managed by a physiatrist and wanted electrodiagnostic testing performed.

On March 10, 2004, plaintiff again saw Dr. Lavespere. Plaintiff still reported numbness and tingling in both hands and in his right leg, as well as insomnia. Lortab, Relafen and Xanax were

again prescribed.   It was noted that there was some problem
obtaining approval for an EMG which Dr. Appley wished to see
performed.   The EMG and nerve conduction studies were finally
performed on April 6, 2004 by Dr. Daniel L. Hodges.  They indicated
high probability of left L5 radiculapathy with no clear cut
findings on the right lower extremity exam to suggest occult
radiculapathy.  Approval was finally obtained on the same date for
plaintiff to consult with a physiatrist and an appointment for him
was made with Dr. Hodges.  Dr. Hodges further noted carpal tunnel
findings on the right and problems at C5 through C7 consistent with
low grade radiculapathy.

On April 13, 2004 plaintiff again saw Dr. Lavespere.  He noted
that plaintiff was still complaining of numbness and tingling in
his left leg and right arm numbness.   His medications were
continued.   On April 19, 2004 per instructions from Dr. Berard
plaintiff was placed on Cialis instead of Levitra.

On May 4, 2004 plaintiff again saw Dr. Lavespere and recounted
that he had gone on a vacation to Florida but was unable to get in
the water because he "freaked out".  He complained of numbness in
both legs and problems with his hands as well as neck and muscle
spasms.  His various medications were continued.

On May 27, 2004 plaintiff again saw Dr. Alan Appley,
complaining of low back pain radiating into both lower extremities.
The doctor noted evidence of left C5 through C7 radiculapathy and

mild right carpal tunnel syndrome. Plaintiff complained of headaches with neck and arm pain and right hand numbness. Dr. Appley expressed concern about the emotional impact his injury was having on plaintiff's perception of pain. Updated cervical and lumbar myelograms and CT scans were recommended.

On June 28, 2004, plaintiff consulted with Dr. Daniel Hodges for pain management purposes. He was complaining of constant aching pain in his neck and mid to lower back, numbness to both hands and in his left buttocks and thighs. He returned again to Dr. Hodges on July 15th. It was then noted that plaintiff had a multiplicity of complaints regarding his neck and back. A myelogram and CT scan of the lumbar and cervical spines were scheduled for the following week. His medications were continued.

The myelograms went forward on July 20, 2004 at Acadian Imaging Center. The cervical myelogram revealed right paracentral disc protrusion at C5-6 and spondylosis at C4-5. The lumbar myelogram revealed degenerative disc disease at L5-S1 with probable small disc protrusion. A subsequent CT scan of the lumbar spine post myelogram showed mild degenerative disc space narrowing at L5-S1. Posterior spurring was present. It was noted that the patient had a central interposed disc protrusion which appeared to abut the ventral aspect of the thecal sac without definite displacement or canal stenosis. Plaintiff's medications were continued by Dr. Hodges on July 22nd.

17

On July 26th, Dr. Appley, having seen the cervical and lumbar myelograms and CT scans, opined that the studies revealed a central disc herniation at L5-S1 and foraminal stenosis on the right at C5-6. He further opined that there appeared to be a disc herniation on the left at C4-5 with evidence of nerve root cut-off on the CT scan. There was also evidence of right carpal tunnel syndrome. The doctor opined that there was significant spondylosis and potential nerve root impingement at C4-5 and 5-6, as well as significant degenerative disc disease at L5-S1 with a central disc herniation. He did not feel at that point that surgery would be likely to improve plaintiff's condition dramatically and preferred that plaintiff work with Dr. Hodges to see if relief could be obtained in that fashion.

On July 20, 2004, plaintiff returned to Dr. Lavespere who continued his medications and noticed his reports of anxiety.

On August 5, 2004, plaintiff again saw Dr. Hodges. He complained of ongoing neck and back pain. Physical examination revealed low back pain upon hyper-extension, lateral bending and rotation. Tenderness was noted throughout the trapezial levator groups. His currents medications were continued. On August 18, plaintiff saw Dr. Lavespere who noted that he was slightly improved but was suffering nausea from his medication at times. Anxiety and depression were noted as was the fact that plaintiff was suffering with crying spells. He noted that plaintiff was planning to go

18

with friends to Mexico to get away.

On September 16, plaintiff returned to Dr. Lavespere as he did on October 4th and October 26th, 2004. In each instance, the doctor seemed to feel that plaintiff was about the same. His medications were renewed. On October 4th plaintiff noted financial difficulties and inability to do minimal work.

On October 6th, plaintiff consulted with Dr. Daniel Hodges complaining of ongoing back and neck pain, pain in both shoulders, his right arm, right hand and left leg, with numbness as well as weakness in the hands and legs. He described a constant aching and burning pain. According to plaintiff, walking, sleeping, bending, stooping and activity exacerbated the pain, whereas medication, rest and heat assisted him. His current medications were listed as Lortab, Lexapro, Xanax, and Xanaflex. He complained of headache, anxiety, depression and problems falling and remaining asleep. It was noted that plaintiff had findings of carpal tunnel syndrome and multi-level cervical and lumbar disc disease with peripheral entrapment neuropathy. Plaintiff was put on Ambien to assist with sleep deprivation. It was noted that the plaintiff was currently awaiting surgical stabilization.

On October 20, 2004, Dr. Hodges noted that plaintiff continued to complain of back and neck discomfort and pain in his legs, right arm, wrist and hand. He continued to complain of numbness and weakness in hand and legs, as well as headaches, sexual

dysfunction, anxiety, depression and sleep deprivation. Examination of his neck revealed restrictive range of motion with tenderness in the trapezial levator groups. Forward flexion was limited to the mid-shaft tibia secondary to pain. Hyper-extension and lateral bending and rotation caused discomfort. Multi-level cervical and lumbar disc disease with intermittent radiculapathy and persistent sleep deprivation were diagnosed. Ambien was discontinued. He was started on Elavil. Hydrocodone and Xanax were continued.

On November 29th, plaintiff again reiterated neck and back complaints as in prior visits. Numbness in his left leg, headache, anxiety, depression, sexual dysfunction and sleep deprivation were also documented. His range of motion in the spinal area had decreased. He had significant discomfort in his trapezial levator groups bilaterally. Multi-level cervical and lumbar subacute radicular changes were noted. Plaintiff indicated that he wished to pursue the option of surgery, but would continue to deal with his underlying post-traumatic stress disorder.

Plaintiff had a follow-up appointment with Dr. Hodges on February 3, 2005, without any specific notations coming out of that visit. On March 9, 2005 he consulted with Dr. Alan Appley. Examination of plaintiff's lumbar spine showed that his condition was unchanged. As to the cervical spine, muscle spasms were noted bilaterally but worse on the right side. He had a decreased range

of motion.   A cervical and lumbar MRI were ordered.

On April 6, 2005, plaintiff again saw Dr. Hodges complaining of worsening symptoms.   On May 16, 2005, Dr. Appley reported that plaintiff's headaches were worsening and lasting longer. His neck pain was unchanged, but he had bilateral shoulder pain and numbness to the left hand was increasing.   There was no significant change in his lower back symptoms.   The doctor further opined that the MRI performed on May 3, 2005 at Acadian Imaging showed persistent spondylosis with disc osteophyte complexes at C4-5 and 5-6.   There was bilateral neural foraminal narrowing at both levels.   A central disc herniation with slight inferior migration existed, but was unchanged from a previous study.   There was interspace narrowing with disc dehydration.   Plaintiff was diagnosed as suffering with carpal tunnel syndrome, spondylosis of the cervical spine with a herniated nucleous pulposus in both the cervical and lumbar spine areas.   EMG and nerve conduction studies were recommended bilaterally for the upper extremities and cervical spine surgery was recommended at C4-5 and 5-6.

Plaintiff saw Dr. Hodges on June 8th and again on August 8th. It was noted that plaintiff was scheduled for a cervical spine surgery with Dr. Appley in the future.   His current medications were continued.   On October 10th, Dr. Hodges noted that although Dr. Appley had clearly given his recommendation for cervical spine surgery, the insurance carrier was not reacting quickly to the

suggestion and a second opinion with a neurosurgeon had been scheduled.

On January 18th, 2006, Dr. Appley noted that plaintiff's evaluation by way of second opinion was shortly to go forward with Dr. Juneau.  Following his January 20, 2006 evaluation by Dr. Patrick A. Juneau, III, a neurosurgeon, Dr. Juneau concurred that plaintiff was a candidate for anterial cervical discectomy with instrumented fusion at C4-5 and C5-6.  The doctor noted that plaintiff also had a central disc protrusion at L5-S1 and, because he had not responded favorable to physical therapy, the doctor felt he was a candidate for left L5-S1 microdiscectomy as well.  In his report, the doctor opined that the need for surgical intervention on the cervical and lumbar spine was causally related to the accident of September 11, 2003.

At his March 29, 2006 visit with Dr. Hodges, it was noted that plaintiff had then been approved for spine surgery and that Dr. Appley wanted a follow-up MRI prior to surgery of the cervical spine.

On April 20, 2006, Dr. Appley performed a right carpal tunnel release. Dr. Appley noted significant impingement of the median nerve through the right carpal tunnel.  He further documented significant thickening of the transverse carpal ligament and felt that there was excellent nerve decompression at the completion of the procedure.  Dr. Appley also performed an anterior

microdiscectomy and osteophytectomy at C4-5 together with an anterior application of a machined interbody device at the same level. The same procedure was performed at C5-6. C4-5-6 anterior instrumentation with the Medtronic Atlantis Vision cervical spine locking plate was installed. Dr. Appley's preoperative and post-operative diagnoses remained the same, those being cervical spondylosis and cervical radiculapathy secondary to cervical spondylosis.

On May 3, 2006, Dr. Hodges noted that plaintiff was post-cervical spine surgery with good pain abatement. His carpal tunnel scar was healing well and while his cervical range of motion was limited, the healing process was progressing. Dr. Hodges felt that plaintiff had done remarkably well in recovering from his recent surgery and noted that he would be scheduled for lumbar surgery in the future.

On May 5, 2006, Dr. Appley, himself, noted that plaintiff was doing well following his carpal tunnel release and that he had a resolution of his hand numbness. His strength was better in his neck and his shoulder and arm pain were much improved. His x-rays showed satisfactory screw, plate and graft positioning in the neck with a normal alignment. Dr. Appley noted that he would discuss plaintiff's low back condition with him at his next appointment because he was still having significant hip, buttock and leg pain as well as low back pain.

On June 19, 2006, plaintiff had minimal arm discomfort and only some discomfort in his right thumb, but no numbness in his hands. His wounds had healed well. The doctor was satisfied with the positioning of the hardware in plaintiff's neck, but noted that plaintiff was still having significant issues with his low back. On July 10th, Dr. Hodges noted that plaintiff had experienced excellent pain abatement from his recent surgeries. His medications were continued. It was noted that he was unfit for work duty and that he was awaiting lumbar stabilization via Dr. Appley. On July 26, 2006, Dr. Appley noted that plaintiff had continued improvement with respect to his neck and arm pain, but that his low back pain had worsened and that it was radiating into the left hip and posterior lateral thigh. An updated MRI revealed significant disc degeneration and a central disc herniation at L5-S1 with inferior extrusion. There was significant disc space narrowing. Straight leg raising on the right was positive for hip and leg pain at 30 degrees, but negative on the left. Dr. Appley suggested provocative lumbar discography by Dr. Hodges to verify problems at L5-S1.

On September 26th, Dr. Stairs performed provocative lumbar discography. The L5-S1 level was painful and it was felt that plaintiff was a candidate for surgery at that level. To date that surgery has not occurred.

Additionally, plaintiff has undergone significant counseling

with Dr. Michael Berard, a clinical psychologist. It was immediately recognized by Frank's Casing that various of its personnel involved in the incident of September 11, 2003 were suffering psychological changes and needed assistance. As a result, individuals such as Mr. Campbell were referred to Dr. Berard by Frank's Casing for counseling.

On September 25, October 1 and October 6, 2003, a comprehensive clinical assessment of Mr. Campbell was performed by Dr. Berard. Dr. Berard reviewed all of plaintiff's medical records from 1996 forward and opined that plaintiff had maintained gainful and consistent work despite exacerbation of a lumbar problem in 2001 up until the date of the accident. The doctor confirmed that plaintiff faced a near death experience that involved intense fear, helplessness and potential for serious injury. At the time of his interviews, plaintiff described unresolved orthopedic and neurological pain related symptomology and was taking medication for those symptoms with marginal relief. The interview process caused plaintiff to re-experienced the initial trauma through recurring dreams, intrusive thought patterns and flashbacks associated with environmental conditions that represented the trauma. He was hyper-vigilant, engaged in avoidant behavior patterns and reported obsessive worrying about his dysfunctional status. He recounted insomnia, irritability, difficulty concentrating and diminished pleasure. Plaintiff was moody with

displacement of his anger, had decreased sexual desire and erectile dysfunction.

Dr. Berard diagnosed acute, post-traumatic stress disorder with no pervasive personality disorder being identified. He felt that chronic pain syndrome associated with both psychological and general medical conditions had to be ruled out and that psychotropic medication would be of assistance and should be prescribed by his treating physician. In discussion with Dr. Lavespere, Dr. Berard recommended Remeron and Klonipin to assist plaintiff in his recovery.

At his October 22nd session with Dr. Berard, plaintiff was calmer but complained of exacerbation of his pain, which generated aggravation, agitation and near explosive responses.

By November 6, 2003, plaintiff expressed concerns as to the side effects of his medication. At that time he was taking Soma, Lortab, Remeron and Klonipin. The combination of these medications could create a sedative or lack of coordination effect in the doctor's opinion. Plaintiff expressed problems with extreme anger and concern at being unable to take part in his children's activities.

By December 1, 2003, plaintiff reported continual difficultly coping with pain and discomfort. An increase in his pain symptoms was reported to Dr. Berard. From a psychological perspective, the doctor noted that plaintiff was pulling away from his family and

from the things that he used to enjoy doing.  Plaintiff expressed difficult coping with the pain, his inability to work, financial issues and his inability to deal with his family as he used to as well as his moodiness. By this point, he was taking Xanax, Remeron, Lortab and Soma tablets.

On December 23rd, he reiterated the level of his pain in his cervical and neck area and between his shoulder blades.  Lumbar pain and discomfort and radicular pain and numbness in his lower extremities were also stated, as were the difficulties in dealing with spasms in his legs.  From a psychological standpoint, Dr. Berard noted that plaintiff remained hyper-vigilant and was extremely sensitive from an emotional perspective.  He found it difficult to remain alone when his wife and children were out of the house.  He further discussed the current lack of intimacy in his marriage.  Plaintiff's medicine included Xanax, Remeron, Lortab and Soma.

On January 15, 2004, plaintiff recounted a dream wherein the boat that he was on was falling apart and he was forced to jump overboard.  He related that he felt that he was pulling away from his family and that he was agitated.

Plaintiff further advised that his wife had been working and that this disturbed him because, when she was away and he was at home, plaintiff was frightened that something was going to happen to his wife and children.  He further advised that he did not like

27

being alone by himself at his house.  Plaintiff was still on Lortab, Soma, Remeron and Xanax.  Although plaintiff acknowledged a positive response from the medication, he noted that it had caused him to put on weight.

By February 9th, plaintiff advised that he was upset by having been told that he had to assume a more direct financial responsibility for his medical insurance, causing him to feel abandoned by the company.  He described increasing financial concerns as he remained unemployable.  Plaintiff recounted his physical discomfort from his neck and back.  From a psychological standpoint he was dreaming of being on a rig, but ending up in the water.  Plaintiff expressed extreme anger and was instructed in anger management techniques.

By March 1st, it was noted that plaintiff was coping at a marginal level and was expressing anger and resentment about delays in payment approval by the worker's compensation carrier regarding diagnostic procedures that Dr. Appley wished to perform.  He was also advised that he was being terminated by his employer.  Plaintiff described acute anxiety while in Florida on the beach.

On March 22nd, plaintiff expressed anger and resentment about the interruption and delay of treatment recommended by Dr. Appley. He expressed concern about his inability to provide the monthly payment on his Cobra plan.  On April 12th, plaintiff described difficulty in coping with his limitations; anger management

28

techniques were emphasized.

On May 4th, plaintiff's agitation and aggravation were again documented.  He insisted that his wife terminate her employment because he did not feel that he could care for his children. He further documented sexual dysfunction associated with pain. Plaintiff's sleep patterns were erratic.  On May 24th, desensitization techniques were discussed after plaintiff became uncomfortable while at a friend's house because of something which reminded him of a rig.  At this point, plaintiff was taking Xanax, Remeron, Xanaflex and Lortab.

Plaintiff consulted with Dr. Berard again on June 7th and on June 11th consulted telephonically with Dr. Berard from Florida where he was attempting to desensitize himself to water while at the beach with his family. On June 28th, he advised the doctor that he would start shaking when standing by the side of the swimming pool on vacation.  On July 19th, the doctor noted that plaintiff appeared tense and slightly depressed.  He was scheduled to have a myelogram the next day and stated that he hated needles.  He discussed a deposition which had taken place the prior Saturday, stating that he had gotten terribly upset and had bitten down so hard that he cracked his lower tooth.  Plaintiff recounted a dream wherein his son was drowning in a swimming pool.

On August 10th, plaintiff reported a positive response to Lexapro.  The doctor noted that he was still preoccupied with

safety and was hyper-vigilant, but that he was more emotionally balanced.  On August 30th, he described increased physical activity and attempts to do things with some of his friends.  The doctor noted that he appeared calmer from an emotional standpoint and more logical in his responses.  He did however, describe increasing levels of anxiety and avoidant behavior as he approached a vocational evaluation.

In a report to plaintiff's counsel, David Abraham, on September 1, 2004, Dr. Berard advised that plaintiff was continuing to experience symptoms and behaviors consistent with post-traumatic stress disorder.  He continued to report exacerbation of anxiety which provoked avoidant behavior when faced with environmental conditions that symbolically represented the traumatic event.  Dr. Berard expressed concern plaintiff might be overwhelmed if he were forced to undergo an independent medical examination with a stranger at that point and time.

On September 7th, plaintiff appeared tense and depressed.  His IME was to take place the following day and he perceived himself to be under surveillance.  It was noted that he was then prepared for surgical intervention in regard to his lower back if it were recommended by his physician.

On September 14, 2004, plaintiff reported that he had successfully undergone the scheduled IME but then, several hours after its conclusion, he became extraordinarily angry because he

believed what happened on the rig was the reason that he was having to undergo his current problems.  He expressed resentment that he had to see doctors "just to prove that we almost lost our lives".

On September 28th, plaintiff reported that he has confronted the water by swimming and floating in a pond with his friend.  He further stated that he was trying to do more around the house but also advised that he had unresolved agitation, anger and resentment because of the pain he was experiencing.  He still acknowledged sexual dysfunction.  Plaintiff was taking Lortab, Xanax, Lexapro and Xanaflex.

By October 21st, Dr. Berard reported that plaintiff appeared more relaxed and emotionally balance with transient periods of agitation and aggravation associated with pain.  He still had problems with insomnia.  Dr. Hodges at that point prescribed Amitriptyline and plaintiff was otherwise taking Lexapro, Lortab, Xanax, and Xanaflex.  Plaintiff had been attempting to go fishing with his friends.

On November 11th, it was reported that plaintiff was relaxed and calmer.  He was attempting to do more but reported two distressing dreams with elements reminiscent of the September 11th accident.  Plaintiff discussed fear in enclosed spaces with the doctor and still expressed difficulties with sexual performance.  On November 30th, plaintiff advised that his pain had gotten worse and so had his agitation. Financial worries were discussed as was

the fact that his wife would have to resume employment.

On December 13th, plaintiff's pain was increased as was his level of agitation and aggravation as well as sadness. His financial issues seemed to be escalating. Plaintiff was then taking Elavil, Lortab, Xanax, Lexapro and Xanaflex.

On January 17th, Dr. Berard felt that plaintiff was improved from a psychological perspective, but he still described unresolved pain and conflict at the probability of facing surgery. He advised that his wife had to spend three days in the hospital because she had suffered a miscarriage and he did not have sufficient money to deal with the bills. He advised that he thought she might qualify for the Medicaid program.

On February 15th, plaintiff appeared agitated and aggravated because of exacerbation of his pain associated with any attempt to expand his lifestyle or increase his physical activity. He advised that he occasionally experienced intrusive thoughts and that he was frightened of the idea of surgery.

On March 10th plaintiff was observed to be agitated and aggravated. His attempts to be more active result in an exacerbation of his pain and discomfort. He advised the doctor that he was at a point where he simply could not cope with his pain and that he just wanted to get things fixed.

On April 5th, plaintiff appeared visibly distressed and near tears, having had what he described as the worst argument of his

marriage with his wife. He described increasing pain and discomfort which significantly affected his tolerance and frustration levels. Plaintiff described financial stressors. He was again upset because his wife was supplementing their income by crawfishing with her father. Plaintiff's medications included Lortab, Xanax, Lexapro, Nexium and Elavil.

On April 26th, plaintiff advised the doctor that he was physically doing as much as he could but he was still upset because his wife was crawfishing. He described another explosive argument with his wife. On June 2nd, plaintiff advised that he had not experienced any traumatic dreams but did have intrusive thoughts. On June 23rd, plaintiff advised of difficulties that he experienced while in Austin with his family at a water park. As of July 14th, plaintiff advised that he had attempted to go back into the water after having a bad experience in Austin but felt uncomfortable and had to get out of the water. He related another argument with his wife and his difficulty in accepting his dysfunctional status.

Plaintiff again saw Dr. Berard on August 4th and October 13th described efforts taken in connection with coping with Hurricane Rita. He consulted with Dr. Berard on November 3rd, November 29th, December 20th at which time he advised that he knew he had to have surgery because now his left leg was giving out on him.

He again saw the doctor on January 12, 2006 and on January 24th advised that he had been evaluated by Dr. Juneau who appeared to

agree with Dr. Appley that surgical intervention was appropriate. Plaintiff advised that he was frightened to have surgery but was also pleased that something might be done to correct his pain.

On February 1st, he again expressed anxiety attendant to having surgery which was consistent with his presentation on February 22nd and March 15th but at that time he also advised the doctor that he was hopeful of getting on with this life.  He consulted with Dr. Berard on April 6th and advised that his surgery was upcoming on April 20th.  He described more traumatic dreams as surgery approached.

On April 25th, he advised the doctor that he was doing well after surgery had been performed on his neck and wrist. On May 8th he reported his happiness with the results of the surgery which Dr. Appley had done.  Prior to the surgery, he recounted specific dreams which Dr. Berard felt were consistent with a reactivation of PTSD associated with stressful situations.

On June 1st, plaintiff again remained positive about the surgery that was performed but expressed concern about the discomfort in his lumbar area with radicular symptoms.  He described recurrent dreams.  His medications included Lortab, Xanax, Lexapro, Elavil and Xanaflex.

On June 22nd, plaintiff appeared calm and relaxed and recounted success in facing the ocean when he was on vacation with his family at Gulf Shores.  He seemed pleased with the success of the surgery

34

Dr. Appley had performed on his neck and hand but stated that his lumbar pain had remained unabated.   He discussed the need for surgery to deal with that issue.   Plaintiff was taking Lortab, Xanax, Lexapro, Elavil, Nexium and Topral.

On July 5th, plaintiff appeared agitated and aggravated.   He reported that two of his dogs had been poisoned within the last several months and that he contacted the police recently because two men had been on his property.   The doctor found that he was hyper-vigilant and there was some suggestion that he might be hallucinating.

On July 11th, Dr. Berard noted, following a conversation with plaintiff's wife, that plaintiff was in jail.   Plaintiff apparently had engaged in an altercation with an individual who criticized both him and a friend of his.   There was some question as to whether plaintiff had pointed a gun at the critical individual. Mrs. Campbell was overwhelmed at this turn of events and was afraid of her husband.   She told Dr. Berard that plaintiff had not behaved in this fashion before the accident. There seemed to be some issues as to whether or not plaintiff had been abusive with his wife as well.   At that point, Mrs. Campbell was questioning whether or not plaintiff should be committed.

Dr. Berard discussed with plaintiff's counsel whether or not plaintiff was engaging in distorted thinking that was placing him at risk and others in harm's way.   Dr. Berard advised that he did

35

not perceive that plaintiff was suicidal or homicidal and recommended continued outpatient treatment with more intense evaluation of his current medications.

On July 12th, plaintiff and his wife met with Dr. Berard and discussed the events of the prior day. Plaintiff contended that the reported complaint against him was fabricated and a total lie. He denied ever seeing the individual who allegedly was threatened and stated that he merely defended himself against the complainant's dog, a pit bull, admitting that he actually pointed a gun at the dog's head. Plaintiff spent most of the prior night in jail.

Dr. Berard noted that plaintiff perceived that because of his disabled status, he could not protect himself and his family adequately. He complained of being unable to get close to his wife and children because they knew he had a mental disorder. He further advised that it was increasingly difficult for him to trust people and that his best friend had stolen money from him while visiting his house. Plaintiff denied any suicidal or homicidal thoughts but reiterated that he hated what was happening to him and his family and felt that he needed to defend himself. At the conclusion of the session, plaintiff agreed to remove all firearms from his home and to be more sensitive to environmental conditions including individuals that represented negative stimuli which could precipitate conflicts. He also agreed to a modification in certain

36

of his medications.  Plaintiff advised that he planned to spend a few days with his family in Texas.

On July 13th, a change in plaintiff's prescription for Elavil was implemented to assist with pain and discomfort as well as sleeping and agitation.  Plaintiff acknowledged that he had, in fact, turned over all of his firearms to his father.

On July 27th, plaintiff claimed that someone had stolen his medications while he was in Texas as well as pictures of his children that he had stored in a bag with his medications. Plaintiff stated that he reported this to the police.  He described feeling clammy, sweaty, irritable and itchy as well as unable to sleep due to restlessness at night.  It was noted that a recent MRI was performed after consultation with Dr. Appley; it was determined that he had a herniated L5 disc.  Dr. Appley prescribed Lortab for pain.  Dr. Berard felt that plaintiff was more positively oriented at this time and less preoccupied with conflict.

On July 28th, plaintiff reported that someone had turned in the bag with his medication and pictures to the Cameron Parish Sheriff's Office, having found it along the side of the road. Everything was noted to be in the bag.  Plaintiff told Dr. Berard that anyone who suspected him of selling or misusing his medication was obviously incorrect.  On that same date, he reported numbness in his lips and tongue as well as fever blisters.  Dr. Berard suggested that he resume taking Xanax which plaintiff resisted

37

doing.

On August 2nd, Dr. Berard noted that plaintiff was coping effectively at this point.  He had decided to increase his Xanax as suggested and continued with Elavil and Hydrocodone.  A discogram was scheduled for August 31st after which Dr. Appley was to suggest what type of surgical intervention might be appropriate.

On August 15th, plaintiff reported feeling pretty well.  He maintained a positive response to the surgical procedure that Dr. Appley had already performed on his neck and seemed optimistic about the possibility of lumbar surgery following the discogram which was scheduled.

On September 13th, it was noted that the discogram did not go forward as originally scheduled because the workman's compensation carrier had not approved it in a timely fashion.  Plaintiff had moved out of his house and was staying with this brother-in-law and appeared worried, sad and tense.  Plaintiff stated that he did not wish to argue with his wife in front of his children and felt that his marriage was falling apart.  He likewise expressed a belief that he had wasted three years of his life because of this injury. He expressed his concern with having become dependent upon people.

On October 4th, it was noted that plaintiff was distressed, agitated, angry and resentful.  He reported ongoing conflicts with his wife.  He related that Dr. Stairs had performed the discogram and advised that he had a ruptured disc, which was preoccupying

38

plaintiff's thoughts.  Plaintiff further advised that Dr. Appley had told him that surgery needed to be done as soon as possible. Plaintiff described excruciating pain associated with the discogram procedure.  Both plaintiff and his wife acknowledged that they understood their marriage was at risk and were concerned about the effects of this on their children.

On October 12th, plaintiff's wife advised Dr. Berard that it was increasingly difficult for her to cope with her husband's aggressive behavior toward her and that he had become physical with her.  She described her husband as detached and stated that he spent most of his time with others because he claimed that she lacked understanding of his situation and the condition he faced.

On September 8, 2004, plaintiff underwent an independent psychiatric evaluation by Dr. John W. Thompson, Jr., Director of the Department of Psychiatry and Neurology at Tulane University. At the time of his evaluation, plaintiff told Dr. Thompson that he was still having problems with depression and labile mood.  He reported crying spells for no apparent reason and that he was having difficulty experiencing pleasure.  He reported that since he had a change of medication which included Lexapro, he had begun working with his animals again.  Plaintiff advised that his sleeping patterns were irregular and that he had guilty feelings about jumping off the rig when others were still not evacuated. Plaintiff denied any manic symptoms or any suicidal thoughts.

39

However, he did admit to generalized feelings of anxiety and worry which included panic attacks.   The doctor acknowledged that plaintiff had experienced a life threatening event which included fear and helplessness during the incident and which had resulted in flashbacks.  At the time of this evaluation, plaintiff acknowledged that his medications were Xanaflex, Lortab, Lexapro and Xanax.

Dr. Thompson confirmed that plaintiff was suffering with post traumatic stress disorder.  He noted that plaintiff had suffered an event that threatened his life and invoked fear and helplessness. Dr. Thompson further noted that plaintiff had experienced distressing recollections since the accident and persistent symptoms of avoidance.  He noted that plaintiff became emotionally distraught while discussing the events involved with the rig collapse and demonstrated emotional affect when describing his realization that he was fearful of the events and fearful that he might lose his life and never see his children and wife again.  Dr. Thompson further opined that Mr. Campbell did not demonstrate overt signs of malingering during his evaluation and noted that plaintiff had a fair to good prognosis.   Dr. Thompson opined that Mr. Campbell's psychiatric symptoms stemmed primarily from the accident of September 11, 2003.  Lastly, the doctor noted that plaintiff had a strong desire to return to work and he felt that he would be able to do so at some point in the future.   However, he could not predict when he might be able to return to work offshore due to his

40

present emotional state.  The doctor did, however, qualify that by saying that it was his opinion from a psychiatric standpoint that plaintiff should be able to return to work onshore within an eighteen month period.

Dr. Thompson performed a follow-up IME on November 29, 2006. In his report the doctor acknowledged that Mr. Campbell reported great improvement to his pain symptoms in the upper extremities following his neck surgery on April 20, 2006.  However, he reported still having pain in the lower back and legs.  Plaintiff also stated that his carpal tunnel surgery was successful.  Plaintiff advised that he had a decrease in the number of disturbing dreams pertaining to this incident but reported difficulty controlling his temper and feelings of aggravation while dealing with financial difficulties.  He felt that he could not be the father and husband that he used to be because he could not perform financially or intimately with his wife.  Plaintiff described feelings of depression but also reported that he was able at times to have fun with this family.  He still experienced interrupted sleep secondary to pain, but denied excessive guilt, decreased energy or decreased ability to concentrate. Plaintiff still reported anxiety as to his future and difficulty leaving home for fear that he would be videotaped for purposes of it being used against him.  Plaintiff still reported symptoms of post-traumatic stress symptomology which had decreased over time.  But he still experienced difficulty in

41

close spaces such as elevators.  At the time of this evaluation, plaintiff was on Xanaflex, Lortab, Lexapro, Elavil, Xanax and Nexium.

Dr. Thompson found plaintiff's thought processes were logical, goal directed and coherent.  He did not appear paranoid, bizarre or disorganized during the evaluation, although he was wary of Dr. Thompson in his capacity as an independent medical examiner. Plaintiff's thought content was without delusional beliefs and he denied auditory, visual or other types of hallucinations. Plaintiff's judgment appeared good.

Dr. Thompson noted Megan Ciota's findings subsequent to psychological testing which indicated that plaintiff had elevated pain complaints on objective testing.  She felt that certain of his physical symptoms were being magnified.  Dr. Thompson concluded that plaintiff was suffering with post-traumatic stress disorder in partial remission because of psychiatric medication.  It was noted that plaintiff's avoidance symptoms appeared to have improved. Dr. Thompson also noted plaintiff suffered from a pain disorder associated with psychological factors and his general medical condition.  Again the doctor noted that he did not see overt signs that plaintiff was malingering but he did note mild elevations in scales that might be consistent with exaggeration of psychological symptoms in Dr. Berard's testing and further noted that Dr. Ciota felt that plaintiff may be minimizing pre-existing problems and

42

emphasizing accident or injury related issues.  Dr. Thompson felt that plaintiff could return to land-based work within a year of the date of his evaluation and, if lumbar surgery were successful, plaintiff should be able to improve from a psychological standpoint as well.

Succinctly stated, the major issue with regard to this matter, is the extent to which the plaintiff's current physical condition has been caused and/or exacerbated by the rig collapse of September 11, 2003.  In other words, is the rig collapse in question the proximate medical cause of plaintiff's physical disabilities?

The record clearly documents that plaintiff had little, if any, complaints with regard to his neck and wrist prior to the collapse of the rig.  For some number of years, plaintiff had performed heavy manual labor in the capacity of a roustabout and/or hammer's helper.  For example, in addition to working for Marine Drilling in 1997, when he had an admitted injury, plaintiff has worked for Broussard Brothers between July 29, 1998 and April of 2000 in the capacity of roustabout.  Thereafter, he worked for Frank's Casing from April 28, 2000 until November of 2000 in the capacity of hammer's helper, at which point he returned to Broussard Brothers in November, 2000 where he remained until April, 2003.  At that point he returned to Frank's Casing where he was working at the time of his injury.  Plaintiff took pre-employment physicals before being hired on each of these occasions.  At no

time was it suggested that he was unable to perform heavy manual labor.

Neither has it been suggested nor proven anywhere in the record that plaintiff has missed significant work time as a result of wrist, neck or back problems. Nor is there any reason to believe that either Broussard Brothers or Frank's Casing was dissatisfied with plaintiff's work, as it would seem unlikely that he would have been rehired by both Broussard and Frank's Casing if he were not properly doing his job. The Court has no hesitancy in determining that plaintiff's neck surgery and carpal tunnel surgery performed by Dr. Appley were proximately caused by the collapse of the rig in question. The violent manner in which plaintiff was thrown about immediately after the leg of the rig gave way is completely consistent with these types of injuries and as noted earlier, he presented no medical history of symptomatic neck or wrist problems before the accident occurred.

Of greater concern is the back condition that plaintiff now must address. While plaintiff was treated for lower back problems in 1997, he responded well to conservative treatment and it was felt then that he had aggravated a mildly degenerative disc at L5-S1. It was not believed that he was experiencing nerve root irritation at that level and his EMG and nerve conduction studies were considered to be normal. Ultimately, plaintiff was released to return to work.

Plaintiff apparently worked doing heavy duty without further problems until November, 2001 when he consulted with Dr. Roland Miller. At that time, plaintiff did not relate his issues to a specific injury, but simply felt that his complaints were work related. Again, plaintiff was performing in the capacity of roustabout. At that time, plaintiff had pain radiating to his left leg with numbness over the left thigh. Radiculapathy was noted as was the fact that the circumference of his left calf was smaller than that of his right. Left lumbar radiculapathy was noted and conservative treatment was commenced.

As of December 3rd, Dr. Miller suspected plaintiff had a herniated disc at L5-S1 and ordered an MRI scan. A moderate disc herniation was documented by that test. Plaintiff was placed on Demerol for pain. Significantly, however, Dr. Miller did not advise plaintiff that he should not return to work. The doctor opined that he would allow someone with an L5-S1 disc herniation to perform heavy duty work if he wanted to, unless there was evidence of neurological damage.

In this instance, plaintiff had normal feeling in his legs and normal reflexes and by January 9, 2002, he had shown some improvement in his straight leg raising tests, although he still experienced pain. The doctor further opined that he had seen many people with herniated discs who have returned to heavy duty work because "that's their life".

45

Plaintiff's last office visit with Dr. Miller was January of 2002 however, the doctor continued to fill plaintiff's pain medication until May of 2002, at which point he refused to do so, telling plaintiff that he should consult with a neurosurgeon for evaluation.  At that point, Dr. Miller felt that surgery might be needed.  However, he conceded that such a decision would be up to the neurosurgeon.  Dr. Miller felt that there was nothing further that he could do for plaintiff, although a neurosurgeon might have other conservative types of treatment and pain management techniques that he could offer that Dr. Miller could not.

Thereafter, plaintiff began consulting with Dr. Lavespere.  On June 13, 2002, it appeared that plaintiff preferred conservative treatment because he wanted to work and was not prepared to consider surgery at that time.   On his first visit with Dr. Lavespere, plaintiff presented with rotational pain in his back and bilateral paraspinous muscle tenderness at L4 through S1.  His straight leg raising tests were negative.  Dr. Lavespere gave plaintiff medication for pain and an anti-inflammatory.  By August 30, 2002, Dr. Lavespere noted that the plaintiff should see a neurologist because he possibly needed to have surgery.  Numbness and tingling in his left thigh were noted, as was paraspinous muscle tenderness and a decrease in flexion.  Plaintiff again saw Dr. Lavespere on December 11th, February 3rd and March 28th.  His conservative treatment continued with muscle relaxants, anti-

inflammatory drugs and pain medications. Dr. Lavespere has no records pertaining to plaintiff between March 28th and September 13, 2003 which he attributes to a loss of office documentation in Hurricane Lily. However, he states that there was a noticeable difference between plaintiff's prior appearance and how he presented on September 13th, two days after the rig accident. At that time, plaintiff presented with an extremely painful condition to the point that he could not even do a straight leg raising test. Dr. Lavespere succinctly stated his comparison of plaintiff's conditions before and after the accident. Before the accident, plaintiff had chronic lower back pain which Dr. Lavespere felt was manageable with medication and which resulted in plaintiff being functional. After the accident, Mr. Campbell was non-functional with exacerbated pain. Psychologically he was very different in that he was anxious, claustrophobic and mentally unstable. As of October 20th, he had neck pain and numbness in his hand which resulted in his being referred to Dr. Appley.

In connection with the difference in plaintiff pre and post accident, the Court has also given consideration to the testimony of Andrea Campbell, plaintiff's wife, Scott Leonard and Brian Marceaux, plaintiff's friends and to that of plaintiff himself. Mrs. Campbell testified that before the 2003 accident, plaintiff did outside work at home and cared for his animals, participated with his family in different endeavors and was generally active.

47

Since this occurrence, he is depressed and angry, has lost interest in everything he enjoyed before, takes no part in his children's activities such as soccer games which he used to be involved in coaching along with his wife. He has lost interest in sex, is afraid of water and becomes agitated easily. According to Mrs. Campbell, it feels that her husband is not a part of the family any longer and that their marital situation today is not good. She admitted to being frightened of her husband at times and noted that he has thrown things at her on occasion. She also noted that he was arrested in 2006 and his guns are now voluntarily being stored elsewhere.

Scott Leonard a friend of plaintiff's since elementary school advised that he and plaintiff used to raise roosters which were used in cock fighting. However, since the accident plaintiff does not wish to work with animals any longer. He does not work with his dogs, nor does he socialize with Mr. Leonard anymore who used to visit with him fairly frequently. Together they would also work with cars which plaintiff has likewise lost interest in doing. According to Mr. Leonard, plaintiff pushes his family away from him now and seems to be in a world of his own. He expects his wife to take care of outside matters such as the yard which he normally would have dealt with before the accident.

Brian Marceaux has known plaintiff for 20 years and would socialize with him fairly regularly before this incident. Together

they talked about cars and worked on engines together. Since the rig collapse, Mr. Marceaux advises that plaintiff cannot be reasoned with and is not very positive about anything any longer. Before the accident plaintiff was quiet, level-headed and never got into problems. Since the accident, he has depression, anxiety and is not the individual that he used to know before the rig collapse. Plaintiff cares nothing for his chickens and his dogs any longer and is simply a different person.

It is clear that plaintiff did not have a perfect back before this incident occurred. However, plaintiff was functional, he worked consistently even though he needed pain medication to make himself comfortable. It has been adequately documented for the Court that plaintiff's lower back condition has been exacerbated by the accident in question and that it has not returned to its pre-accident condition. Plaintiff is in need of a lower back surgery proximately brought on by his being thrown violently from a bunk and landing on the floor due to the rig collapse. It has also been documented through the testimony of Dr. Michael Berard, the psychologist to whom plaintiff was referred by his employer, Frank's Casing, that plaintiff has a combination of post-traumatic stress disorder and chronic pain syndrome. In order for plaintiff to recover from the post-traumatic stress disorder, the chronic pain must be alleviated through lower back surgery. Clearly the post-traumatic stress disorder from which plaintiff suffers,

49

originated with the September 11th accident. He had no history of psychological treatment prior to that date.

According to Dr. Berard, the future cost of medical treatment for post-traumatic stress disorder is $18,066.00, assuming that plaintiff has his back surgery and gets a good result. The cost of a one-level interbody fusion at the L5-S1 level is projected to cost up to $50,000.00. These expenses are medically necessary to plaintiff's treatment and recovery; they are not palliative in nature; and they are related to plaintiff's on-the-job injury. Lauland v. Hugh Eymard Towing Co., Inc., 2000 WL 533880 (E.D. La. May 2, 2000). The Court need not reimburse plaintiff for the cost of his cervical or carpal tunnel surgeries. This, as the Court understands it, has been paid for by LWCC, the compensation carrier of Frank's Casing. As noted in another of this Court's rulings today, Parker has the right to pass plaintiff's medical expenses back to Frank's Casing via contracts between various parties. Frank's Casing, in turn, has the right to pass the expense back to LWCC. In short, the responsible party has already paid for these surgeries.

According to Dan Cliffe, a C.P.A. specializing in economic analysis and loss of earning calculations who the Court qualified as a trial expert, plaintiff has lost wages through trial of $85,400.00. After crediting against this figure the amount of wage compensation benefits paid by LWCC, plaintiff has been compensated

already for past lost wages.  Since LWCC has no lien on this judgment, no further award of past wages is in order.  In addition, the Court awards plaintiff future lost wages for a three year period at an annual rate of $28,300.00 for a total sum of $84,900.00.  The Court does not believe that plaintiff will be totally disabled from performing all work, assuming his proposed back surgery is successful.  Three years of front-end compensation will allow plaintiff to have surgery, recuperate and obtain reasonable land based employment.

According to Margot Hoffman, an expert in the field of vocational rehabilitation, plaintiff will be restricted to light work post lumbar surgery.  In the Lafayette, Louisiana area, nearby plaintiff's residence in Kaplan, Ms. Hoffman testified that there are dispatcher positions that pay over $30,000.00 per year and sales positions pertaining to heavy equipment which pay amounts greater than $30,000.00 per year.  According to Dan Cliffe, if plaintiff can earn $30,000.00 per year, he would not have a future economic loss.  The Court notes that the award of future wages is always an estimate and, to some extent speculative, as there is no way to foresee the future with crystal clarity.  Michael v. North American Fish Co., 1996 WL 371422 at *6 (N.D. Cal. June 21, 1996).  However, the Court believes that plaintiff can obtain future employment in the range noted.

Lastly, plaintiff is entitled to compensation for his physical

and mental pain and suffering, past present and future, for his neck and carpal tunnel surgeries and for the exacerbation of his back condition and the onset of his post traumatic stress disorder. Plaintiff has performed hard, heavy labor for his whole adult life. The combination of injuries here has prevented him from continuing to work offshore; it has caused significant marital problems and personality changes in plaintiff; it has altered his recreational pursuits and how he deals with his family.

For the physical injuries to his neck and the carpal tunnel syndrome which plaintiff has experienced, the Court awards plaintiff the sum of $ 400,000.00.  Jenkins v. Kerr-McGee Corp., 613 So.2d 1097, 1102-03 (La. App. 3rd Cir.), writ denied, 616 So. 2d 701 (La. 1993); Hoffman v. Travelers Insurance Co., 587 So. 2d 143, 144-45 (La. App. 4th Cir. 1991); Andrews v. Mosley Well Service, 514 So. 2d 491, 498 (La. App. 3rd Cir.), writ denied 515 So. 2d 807 (La. 1987); Champagne v. Lee, 470 So. 2d 378, 381-82 (La. App. 5th Cir.), writ not considered, 472 So. 2d  911 (La. 1985); Thibodaux v. Acme Truck Lines, Inc., 443 So. 2d 716, 718 (La. App. 5th Cir. 1983), writ denied, 445 So. 2d 439 (La. 1984).

For the post-traumatic stress disorder, from which plaintiff still suffered at the time of trial, the Court awards plaintiff an additional $200,000.00.  Nielsen v. Northbank Towing, Inc., 768 So. 2d 145, 157-61 (La. App. 1st Cir.), writ denied, 773 So. 2d 149 (La. 2000); Brodtmann v. Duke, 708 So. 2d 447, 461 (La. App. 4th Cir.),

writ denied, 717 So. 2d 1177, cert. denied, 525 U.S. 1017, 119 S. Ct. 541 (1998).

The Court is of the opinion that plaintiff's post traumatic stress disorder is directly related to the chronic pain that he has suffered with his back.  Dr. Berard has so testified.  The Court believes that the level of plaintiff's current pain exceeds his pre-accident levels and further believes that back surgery should have been authorized for plaintiff before now.  No doctor has opined that plaintiff is not in need of back surgery.  Whether defendant believes that plaintiff's back was in poor condition before the rig collapse, which the Court believes to have been the case, that does not address the question pertaining to the need for surgery to eliminate the post traumatic stress disorder, which plaintiff did **not** have before the September 11, 2003 event.  For this reason the Court has awarded plaintiff the cost for his back surgery.

By the same token, the Court does not believe that plaintiff could have continued indefinitely, through a normal work life expectancy, without his back preventing his continued employment at heavy labor.  Although a tortfeasor takes his victim as he finds him, a tortfeasor is not liable for injuries that are not attributable to his wrongful conduct.  Smith v. Southern Gulf Marine Co. No. 2, 791 F.2d 416 (5th Cir. 1986); Sanders v. Collins, 551 So. 2d 644 (La. App. 1st Cir.), writ denied, 556 So. 2d 1261

53

(La. 1990).   A tortfeasor is liable only for the direct and proximate results of his wrongful acts, including the aggravation of any preexisting injuries.  <u>Coleman v. Lewis</u>, 757 So.2d 907 (La. App. 1st Cir.), <u>writ denied</u>, 768 So.2d 1291 (La. 2000).  For this reason, the Court believes that a conservative amount pertaining to plaintiff's pain and suffering for his back condition is in order and awards the sum of  $200,000.00.  <u>Williams v. McCall's Boat Rentals, Inc.</u>, 2002 WL 465170 (E.D. La. 2002); <u>Cooper v. Lacorte</u>, 775 So.2d 704 (La. App. 4th Cir. 2001); <u>Harvey v. Cole</u>, 808 So.2d 771 (La. App. 4th Cir, 2002).

Accordingly, there will be judgment in favor of claimant, Lonnie Cortney Campbell, and against petitioner-in-limitation, Parker Drilling Offshore USA, L.L.C., in the total sum of itemized as follows:

1.  Past, present and future physical pain and suffering for cervical and carpal tunnel injuries in the sum of $400,000.00;

2.  Past, present and future mental pain and suffering for post traumatic stress disorder in the sum of $ 200,000.00;

3.  Past, present and future physical pain and suffering for lumbar injuries in the sum of $ 200,000.00;

4.  Future lost wages in the sum of $ 84,900.00; and

5.  Future medical treatment in the sum of $ 68,066.00.

Interest on this sum will be payable from the date of loss.

Judgment will issue accordingly.

New Orleans, Louisiana this __28th__ day of September, 2007.


_____
        ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE